**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq.
Laurence M. Rosen, Esq.
Jing Chen, Esq.
275 Madison Ave., 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
lrosen@rosenlegal.com
jchen@rosenlegal.com

*Counsel for Lead Plaintiff*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| YOAV GUTMAN, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>LIZHI INC., JINNAN LAI, NING DING, ZELONG LI, XI CHEN, TAO HUANG, YE YUAN, RICHARD ARTHUR, COLLEEN A. DE VRIES, CITIGROUP GLOBAL MARKETS INC., HAITONG INTERNATIONAL SECURITIES COMPANY LIMITED, AMTD GLOBAL MARKETS LIMITED, NEEDHAM & COMPANY, LLC, TIGER BROKERS (NZ) LIMITED, CHINA MERCHANTS SECURITIES (HK) CO., LIMITED, VALUABLE CAPITAL LIMITED, PRIME NUMBER CAPITAL LLC, and, COGENCY GLOBAL INC.,<br><br>Defendants. | Case No. 1:21-cv-00317-LDH-PK<br><br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br><u>JURY TRIAL DEMANDED</u><br><br><u>CLASS ACTION</u> |

Lead Plaintiff Yoav Gutman, individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their amended complaint against Defendants (defined below), alleges the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters based on the investigation it conducted by and through their attorneys, which included, among other things, a review and analysis of: (i) Lizhi Inc.'s ("Lizhi" or the "Company") public filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) Lizhi's public filings with Chinese regulatory agencies and its local provincial offices; (iii) public reports and news articles; (iv) transcripts of Lizhi's conference calls; (v) interviews with witnesses with relevant information; and (vi) other publicly-available material and data identified herein. Plaintiff's investigation is continuing, and many of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their control or custody. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     Plaintiff brings this securities class action on behalf of persons who purchased Lizhi securities pursuant or traceable to the registration statement and related prospectus (collectively, the "Registration Statement") issued in connection with Lizhi's January 17, 2020 initial public stock offering (the "IPO" or "Offering"), seeking to recover compensable damages caused by Defendants' violations of the Securities Act of 1933 (the "Securities Act").

2.     This action asserts non-fraud, strict liability claims under §§11 and 15 of the Securities Act, against Lizhi, certain Lizhi officers and directors, the underwriters of the IPO, and Lizhi's U.S. representatives (collectively, the "Defendants").

3.     Lizhi is allegedly the largest interactive audio entertainment platform and the largest online user-generated content ("UGC") audio community in China.

4.     Before Lizhi's IPO, World Health Organization ("WHO") had already issued a Disease Outbreak News report and an epidemiological alert to the world reporting the viral pneumonia outbreak in China. This viral pneumonia outbreak was later named as Covid-19. China's Central Television ("CCTV") and Xinhua News Agency, official mouthpieces of the Chinese central government and the Communist Party of China ("CPC"), and various global news media had also reported the "viral pneumonia *epidemic*" in China and analogized it with SARS, the last pandemic that originated in China and quickly swept the world. Countries and regions had taken measures to control the entrance of travelers from China. Chinese Center For Disease Control And Prevention ("China CDC") had already initiated the highest level public health emergency response that is activated only when an extraordinarily severe public health emergency occur in China pursuant to Chinese law and regulations.

5.     Despite Chinese domestic and worldwide reports specifically pointing to the devastating Covid-19 epidemic, Defendants omitted to state in Lizhi's Registration Statement the very risk of the epidemic and its material impact on Lizhi's business, customers, and employees. The Registration Statement merely made a generalized boilerplate risk disclosure, providing no meaningful cautionary language to investors. It reads, in relevant part:

> *We face risks related to natural disasters, health epidemics and other outbreaks, which could significantly disrupt our operations.*
> We *may* be subject to social and natural catastrophic events that are beyond our control, such as natural disasters, health epidemics, riots, political and military upheavals and other outbreaks in the country or region where we have our operations or where a portion of our users or podcasts are located. Such events could significantly disrupt our operations and negatively impact our business, financial conditions and development.

6.     Indeed, by the time of the IPO, the coronavirus was already ravaging China where

Lizhi's majority of the operations was located. The complications associated with the Covid-19 were already negatively affecting Lizhi' business. Because the Registration Statement did not disclose anything about the coronavirus and the reasonably likely impact on its business, investors had no opportunity to consider how the worsening situation might adversely impact the Company and its business.

7.    When Defendants' omissions were revealed, the price of Lizhi shares suffered sharp declines. By the commencement of this action, Lizhi shares were trading below $4 per share, a decline of over 63% from the offering price.

## JURISDICTION AND VENUE

8.    The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l, and 77o).

9.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v).

10.    Venue is proper in this Judicial District pursuant to Section 28 U.S.C. § 1391(b) as the alleged misleading public filings and press releases entered this district.

11.    In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

12.    Plaintiff purchased Lizhi ADSs at artificially inflated prices pursuant and/or traceable to the Company's IPO and was damaged thereby. Its PSLRA certification has been previously filed with the Court and is incorporated by reference herein.

13.     Defendant Lizhi operates a social audio platform for user-generated content in China. Lizhi conducted the IPO in New York, and its ADSs are listed on the NASDAQ Stock Exchange under the ticker symbol "LIZI."

14.     Defendant Jinnan Lai ("Lai") a/k/a Marco Lai founded Lizhi and was, at the time of the IPO, Lizhi's Chief Executive Officer and a Director on Lizhi's Board of Directors (the "Board"). Defendant Lai reviewed, contributed to, and signed the Registration Statement.

15.     Defendant Ning Ding ("Ding"), who also founded Lizhi, was Lizhi's Chief Technology Officer and a Director on Lizhi's Board at the time of the IPO. Defendant Ding reviewed, contributed to, and signed the Registration Statement.

16.     Defendant Zelong Li ("Li") was, at the time of the IPO, a Vice President at Lizhi and a Director on Lizhi's Board. Defendant Li reviewed, contributed to, and signed the Registration Statement.

17.     Defendant Xi Chen ("Chen") a/k/a Catherine Chen was, at the time of the IPO, Lizhi's Chief Financial Officer and a Director on Lizhi's Board of Directors. Defendant Chen reviewed, contributed to, and signed the Registration Statement.

18.     Defendant Tao Huang ("Huang") served as a Director on Lizhi's Board immediately preceding Lizhi's IPO and until the SEC declared Lizhi's Registration Statement on Form F-1, filed in connection with its IPO, effective. Defendant Huang resigned from the Board after first reviewing, contributing to, and signing the Registration Statement.

19.     Defendant Ye Yuan ("Yuan") served as a Director on Lizhi's Board immediately preceding Lizhi's IPO and until the SEC declared Lizhi's Registration Statement on Form F-1, filed in connection with its IPO, effective. Defendant Yuan resigned from the Board after first reviewing, contributing to, and signing the Registration Statement.

20.     Defendants Lai, Ding, Li, Chen, Huang and Yuan are sometimes referred to herein as the "Director Defendants."

21.     Each of the Director Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

22.     Lizhi is liable for the acts of the Director Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

23.     Defendant Richard Arthur ("Arthur") served as Assistant Secretary on behalf of Defendant Cogency Global Inc. ("Cogency Global"), the designated U.S. representative of Defendant Lizhi, and reviewed, contributed to, and signed the Registration Statement.

24.     Defendant Colleen A. De Vries ("De Vries") served as Senior Vice President on behalf of Defendant Cogency Global, the designated U.S. Representative of Defendant Lizhi, and reviewed, contributed to, and signed the Registration Statement.

25.     Defendants Arthur and De Vries, collectively with the Director Defendants, are sometimes referred to herein as the "Individual Defendants."

26.     Each of the Individual Defendants participated in the preparation of and signed (or authorized the signing of the Registration Statement (defined below) and/or an amendment thereto, and the issuance of the Registration Statement.

27.     Defendant Citigroup Global Markets Inc. ("Citigroup") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Registration Statement (defined below). Citigroup served as a representative of all the underwriters. Citigroup also participated in conducting and promoting the Offering. Citigroup's participation in the solicitation of the Offering was motivated by its financial interest. Defendant Citigroup conducts business New York.

28.     Defendant Haitong International Securities Company Limited ("Haitong") was an underwriter for the IPO, serving as a financial adviser for and assisting in the preparation and dissemination of the Company's false and misleading Registration Statement.

29.     Defendant AMTD Global Markets Limited ("AMTD") was an underwriter for the IPO, serving as a financial adviser for and assisting in the preparation and dissemination of the Company's false and misleading Registration Statement.

30.     Defendant Needham & Company, LLC ("Needham") was an underwriter for the IPO, serving as a financial adviser for and assisting in the preparation and dissemination of the Company's false and misleading Registration Statement.

31.     Defendant Tiger Brokers (NZ) Limited ("Tiger Brokers") was an underwriter for the IPO, serving as a financial adviser for and assisting in the preparation and dissemination of the Company's false and misleading Registration Statement.

32.     Defendant Prime Number Capital LLC ("Prime Number") was an underwriter for the IPO, serving as a financial adviser for and assisting in the preparation and dissemination of the Company's false and misleading Registration Statement.

33.     Defendant Prime China Merchants Securities (HK) Co., Limited ("China Merchants") was an underwriter for the IPO, serving as a financial adviser for and assisting in the preparation and dissemination of the Company's false and misleading Registration Statement.

34.     Defendant Valuable Capital Limited ("Valuable Capital") was an underwriter for the IPO, serving as a financial adviser for and assisting in the preparation and dissemination of the Company's false and misleading Registration Statement.

35.     The Defendants named in ¶¶ 27-34 above are collectively referred to herein as the "Underwriter Defendants."

36.     The Underwriter Defendants agreed to purchase and sell Lizhi ADSs to the public as follows:

| Name | Number of Shares |
|---|---|
| Citigroup Global Markets Inc. | 3,590,891 |
| Haitong International Securities Company Limited | 49,605 |
| AMTD Global Markets Limited | 114 |
| Needham & Company, LLC | 188,325 |
| Tiger Brokers (NZ) Limited | 163,154 |
| Prime Number Capital LLC | 97,917 |
| China Merchants Securities (HK) Co., Limited | 114 |
| Valuable Capital Limited | 9,880 |

37.     Pursuant to the Securities Act, the Underwriter Defendants are liable for the false and misleading statements in the Registration Statement. The Underwriter Defendants' failure to conduct adequate due diligence investigations was a substantial factor leading to the harm complained of herein.

38.     The Underwriter Defendants are primarily investment banking houses that specialize, *inter alia*, in underwriting public offerings of securities. As the underwriters of the

Offering, the Underwriter Defendants earned lucrative underwriting fees as a result of their participation in the Offering.

39.     In addition, the Underwriter Defendants met with potential investors and presented highly favorable, but materially incorrect and/or misleading, information about the Company, its business, products, plans, and financial prospects and/or omitted to disclose material information required to be disclosed under the federal securities laws and applicable regulations promulgated thereunder.

40.     Representatives of the Underwriter Defendants also assisted the Company and Individual Defendants with planning the Offering. They further purported to conduct an adequate and reasonable investigation into the business, operations, products, and plans of the Company, an undertaking known as a "due diligence" investigation. During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning the Company's business, financial condition, products, plans, and prospects.

41.     In addition to having access to internal corporate documents, the Underwriter Defendants and/or their agents, including their counsel, had access to the Company's lawyers, management, directors, and top executives to determine: (i) the strategy to best accomplish the Offering; (ii) the terms of the Offering, including the price at which the Company's ADSs would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about the Company would be made in the Registration Statement; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement. As a result of those constant contacts and communications between the Underwriter Defendants' representatives and the Company's management and top executives, at a minimum, the Underwriter Defendants should

have known of the Company's undisclosed existing problems and plans and the material misstatements and omissions contained in the Registration Statement, as detailed herein.

42.     The Underwriter Defendants also demanded and obtained an agreement from Lizhi that the Company would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws.

43.     Defendant Cogency Global was Lizhi's authorized U.S. representative for purposes of the IPO. Defendants Arthur and De Vries, both of whom signed the Registration Statement, were employees of Defendant Cogency Global. As a result, Defendant Cogency Global is liable for the securities law violations committed by Defendants Arthur and De Vries in its capacity as employer and as a control person under the Securities Act.

44.     Lizhi, the Individual Defendants, the Underwriter Defendants, and Cogency Global are referred to herein, collectively, as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### The Covid-19 Had and Spread in China Before Lizhi's IPO and Was Widely Reported As An Epidemic

45.     Information regarding Covid-19 had emerged in China by the end of December 2019, at the latest, when Chinese doctors, hospital officials and regulators reported cases of pneumonia-like symptoms stemming from the Huanan Seafood Wholesale Market in Wuhan, a city in Hubei Province, China. Comparisons were immediately drawn to the 2003 outbreak of Severe Acute Respiratory Syndrome ("SARS"), a pandemic that began in China and was, as stated by WHO, the first severe and readily transmissible new disease to emerge in the 21st century.

46.     Underscoring the threat of this concerning illness, the Wuhan Municipal Health Commission (the "Health Commission") issued an "Urgent Notice" to medical institutions on

December 30, 2019, warning that cases of pneumonia of unknown cause have emerged from the city's Huanan Seafood Wholesale Market, and ordering hospitals to compile and report statistics on all such cases admitted in the previous week, to the Health Commission by that afternoon. Minutes after the Urgent Notice was issued, it was available online in China.  Hours later, the Wuhan Municipal Health Commission issued a second "urgent notice," instructing medical institutions on how to manage patients with pneumonia of unknown cause, and ordering them to track and timely report such cases to district CDCs and the Wuhan Municipal Health Commission. Again, minutes after being issued, this notice was available online in China.

47.     The following day, on December 31, 2019, the Wuhan Municipal Health Commission alerted China's National Health Commission ("China NHC") and China CDC to the numerous cases being investigated in the region, and released its first public briefing on the outbreak, which revealed that medical institutions throughout the city had treated "cases of pneumonia" linked to the Huanan Seafood Wholesale Market, and that 27 cases were under investigation, including seven where patients were seriously ill. The Health Commission also advised citizens *not* to gather or congregate in enclosed areas.

48.     Also on December 31, 2019, several Chinese media outlets, including both *Yicai* (also known as China Business News), which serves as the financial news arm of state-owned Shanghai Media Group, and *Xin Jing Bao* or The Beijing News, which is owned by the CPC, reported on the Wuhan Health Commission's "urgent notices", confirming the presence of atypical pneumonia cases in the region.

49.     Governmental authorities in Taiwan – 80 miles off the coast of mainland China implemented monitoring protocols for travelers from Wuhan on December 31, 2019. Instituting "onboard quarantine," personnel were directed to board arriving planes to evaluate passengers

from Wuhan for fever and pneumonia-like symptoms before releasing them. In addition, Taiwan's Centers for Disease Control sought, via email, "relevant information" on "at least seven atypical pneumonia cases" that were reported by the news in Wuhan, China.

50. On the same day, the Centre for Health Protection (CHP) of Hong Kong's Department of Health published a report titled, "CHP closely monitors cluster of pneumonia cases on Mainland," stating, among other things, that in response to the viral pneumonia, "the CHP's Port Health Division conducts health surveillance measures at all boundary control points. Thermal imaging systems are in place for body temperature checks on inbound travellers. Suspected cases with serious infectious diseases identified will be immediately referred to public hospitals for isolation, treatment and follow-up. The CHP has also informed the Hospital Authority about the cluster of pneumonia cases in Wuhan.

51. On January 1, 2020, Wuhan's Jianghan District government closed the Huanan Seafood Wholesale Market so that it could be sanitized and disinfected. Notably, vendors told The Beijing News that masked workers had been disinfecting the market since at least December 30, 2019.

52. On January 2, 2020, WHO informed Global Outbreak Alert and Response Network (GOARN) partners about the cluster of pneumonia cases in China. GOARN partners include major public health agencies, laboratories, sister UN agencies, international organizations and NGOs.

53. On the same day, the Hong Kong government reported that its Secretary for Food and Health and Controller of the CHP convened and participated in an inter-departmental meeting on Wuhan-related cases, for the purpose of strengthening prevention and control measures. Involved in the meeting were officials from Hong Kong's Department of Health,

Hospital Authority, Education Bureau, Transport and Housing Bureau, Security Bureau, Constitutional and Mainland Affairs Bureau, and many other governmental institutions.

54.     In accordance with that meeting, effective January 3, 2020, and in response to 44 known viral pneumonia cases, the Hong Kong government implemented heightened surveillance procedures to monitor and address the situation; engaged in daily reporting of Wuhan-related cases in public hospitals; instituted boundary checkpoints for those traveling by air or train; implemented thermal imaging systems to monitor body temperature and identify travelers with fever; and recommended cleaning and sanitation protocols for businesses and other institutions in Hong Kong. In addition, Hong Kong directed hospital staff to place patients with suspected cases of infection into isolation rooms and instructed them to immediately inform the CHP, Department of Health and Hospital Authority.

55.     On January 3, 2020, Chinese officials provided information to WHO on the cluster of cases of "viral pneumonia of unknown cause" identified in Wuhan.

56.     On January 4, 2020, WHO tweeted that there was a cluster of pneumonia cases in Wuhan, and that investigations to identify the cause were underway.

57.     On January 4, 2020, the Hong Kong government announced that it had implemented the Preparedness and Response Plan for Novel Infectious Disease of Public Health Significance ("Plan") in response to the threat posed by the coronavirus, activating the "serious" response level. According to the Plan, the "serious" response level – the second highest (of three levels total) "depicts a situation when there is limited spread of the disease in local population, *e.g.*, sporadic or small cluster(s) of infection," but "may also apply to situation[s] when a significant number of human cases of the novel infection with serious health outcomes are reported in places/areas where the trade and travel relationship with Hong Kong is significant."

According to Hong Kong CHP, a novel infectious disease "has the potential to lead to international spread and public health emergency."

58.     As of January 4, 2020, Hong Kong CHP also noted that "[t]he current cluster of viral pneumonia cases in Wuhan can be regarded as a Novel Infectious Disease of Public Health Significance," and was already engaging in public efforts to alert travelers to and from Wuhan of the health situation and the need for increased personal hygiene under the circumstances then existing.

59.     On January 5, 2020, WHO shared detailed information about a cluster of cases of pneumonia of unknown cause through the IHR (2005) Event Information System, which is accessible to all Member States. The event notice provided information on the cases and advised Member States to take precautions to reduce the risk of acute respiratory infections. WHO issued its first Disease Outbreak News report. This is a public, web-based platform for the publication of technical information addressed to the scientific and public health communities, as well as global media. The report contained information about the number of cases and their clinical status; details about the Wuhan national authority's response measures; and WHO's risk assessment and advice on public health measures. It advised that "WHO's recommendations on public health measures and surveillance of influenza and severe acute respiratory infections still apply".

60.     By January 5, 2020, governmental authorities in Taiwan augmented their own efforts to identify potentially infected travelers, by expanding the scope of their monitoring protocol to cover travelers to Wuhan within two weeks, and including those who exhibited fever or symptoms of an upper respiratory tract infection, at the point of entry. Taiwanese officials implemented procedures to screen those travelers suspected of illness for 26 viruses, including

SARS and Middle East Respiratory Syndrome (MERS). Travelers who exhibited symptoms were subject to quarantine and referred for treatment, as needed.

61.     On January 6, 2020, China CDC activated the second level public health emergency response according to China's Emergency Response Law and National Emergency Plan for Public Health Emergencies.

62.     On January 6, 2020, the Hong Kong government held a Steering Committee meeting of governmental officials in accordance with the Plan, at which participants discussed prevention and control measures.

63.     Also, on January 6, 2020, Taiwan's Centers for Disease Control ("Taiwan CDC") emphasized its own effort "[i]n response to the severe pneumonia outbreak in Wuhan, China," and announced plans "to reinforce the implementation [of] quarantine practices at airports and ports," directing healthcare facilities to "heighten vigilance for suspected cases," evaluate patients' travel and circumstances, and implement "nosocomial infection control measures." The Taiwan CDC also advised "travelers planning to visit Wuhan or other neighboring areas in China" to practice suitable personal hygiene, "avoid visiting crowded public places," and "notify the airline crew and the quarantine officer at the quarantine station in the airport/port," or seek medical attention, "[i]f fever or influenza-like illness symptoms develop upon arriving in" or "after returning to Taiwan."

64.     On January 7, 2020, China's President Xi Jinping demanded Chinese officials to take measures to control and prevent the spread of the Covid-19 epidemic at a CPC Politburo Standing Committee meeting. The CPC Politburo Standing Committee is a committee consisting of the top leadership of the Chinese Communist Party. Historically it has been composed of five to eleven members, and currently has seven members. Because China is a one-party state, the

Standing Committee's decisions *de facto* have the force of law.

65.    On January 7, 2020, the Hong Kong government announced its plan to amend regulations to include "Severe Respiratory Disease associated with a Novel Infectious Agent" as a statutorily notifiable infectious disease, requiring doctors and other medical practitioners to notify Hong Kong CHP if they encountered or treated any person with fever or respiratory illness who had visited Wuhan within 14 days before the onset of any symptoms. This regulatory amendment was necessary to vest Hong Kong with legal authority to manage suspected and confirmed cases of the illness if patients refused isolation or quarantine, as appropriate, thus enabling Hong Kong to ensure that any cases of suspected or confirmed illness did not spread further inside or outside of Hong Kong.

66.    On January 7, 2020, BBC reported that the "***pneumonia epidemic***" in China was continuing and that Hong Kong, Taiwan and Macao were raising their surveillance level and taking measures to "***prevent the spread of the epidemic into their regions***".

67.    On January 8, 2020, the Washington Post reported that in Hong Kong, 30 people who have visited Wuhan in recent weeks have been hospitalized with fever, and pharmacies in the city quickly sold out of face masks. The Washington Post also reported that the Taiwanese government said eight people traveling from Wuhan have exhibited fever.

68.    On January 8, 2020, Wall Street Journal reported that Health authorities in Singapore and Hong Kong, cities that have direct flights from Wuhan, have issued alerts and quarantined patients traveling from the region who show signs of fever or breathing difficulties. The Hong Kong government said that it was taking precautions against a "severe respiratory disease associated with a novel infectious agent" and that it is seeking to make it a statutory notifiable infectious disease, meaning doctors would need to report any suspected cases, and

patients evading quarantine could be fined or jailed. The U.S. Centers for Disease Control and Prevention asked health-care providers and state and local health departments to screen patients with severe respiratory illnesses about whether they have traveled to Wuhan.

69.    On    January    8,    2020,    Singapore's    *Lianhe    Zaobao*,    the largest Singaporean Chinese-language newspaper, also reported that Singapore "had been seriously prepared" as to the viral pneumonia started from China, taking temperature measurements from every traveler from Wuhan at the Singaporean airport.

70.    On January 9, China' CCTV and Xinhua News Agency both officially announced that "the etiological analysis of the ***viral pneumonia epidemic***" had shown that the cause was a novel coronavirus. China CCTV is a Chinese state-controlled broadcaster controlled by the Chinese central government and central CPC. CCTV has a network of 50 channels broadcasting different programs and is accessible to more than one billion viewers in six different languages. Xinhua News Agency, or New China News Agency, is China's official state-run press agency. Xinhua is the biggest and most influential media organization in China, as well as the largest news agency in the world in terms of worldwide correspondents. Xinhua is a ministry-level institution subordinate to the State Council (China's chief administrative authority) and is the highest-ranking state media organ in the country alongside the *People's Daily*.

71.    Also on January 9, 2020, WHO reported China's determination of the cause of the viral pneumonia epidemic. WHO convened the first of many teleconferences with global expert networks, beginning with the Clinical Network, for the purpose of controlling the spread of Covid-19.

72.    On January 9, 2020, the Taiwan CDC reported having inspected 14 flights and 1,317 passengers and cabin crew members since first implementing the "onboard quarantine of

all direct flights arriving from Wuhan" on December 31, 2019.

73.     By January 10, 2020, governmental authorities in China stationed personnel at airports and train stations across the region to evaluate travelers, including by administering fever checks.

74.     Between January 10 to 12, WHO published a comprehensive package of guidance documents for countries, covering topics related to the management of an outbreak of the novel coronavirus.

75.     On January 10, 2020, WHO's Strategic and Technical Advisory Group on Infectious Hazards (STAG-IH) held its first meeting on the novel coronavirus outbreak. WHO's Global Coordination Mechanism for Research and Development to Prevent and Respond to Epidemics held its first teleconference on the novel coronavirus, as did WHO's Scientific Advisory Group of the Research and Development (R&D) Blueprint, a global strategy and preparedness plan that allows the rapid activation of research and development activities during epidemics. The Director-General of WHO spoke with the Head of China NHC. He also had a call to share information with the Director of China CDC.

76.     On January 11, 2020, WHO tweeted that it had received the genetic sequences for Covid-19 from China and expected these to soon be made publicly available. Chinese media reported the first death from Covid-19.

77.     On January 12, 2020, Wuhan mandates required local businesses like Kingold Jewelry, Inc. and Levi Strauss & Co to close and halt operations.

78.     On January 13, 2020, WHO convened the first teleconference with the diagnostics and laboratories global expert network. The Ministry of Public Health in Thailand reported an imported case of lab-confirmed Covid-19 from Wuhan, the first recorded

case outside of China. WHO publishes first protocol for a RT-PCR assay by a WHO partner laboratory to diagnose Covid-19.

79.     By January 14, 2020, China had installed 35 infrared thermometers in airports, railway stations, long-distance bus stations, and ferry terminals, and Wuhan began to strictly control travel.

80.     On January 15, 2020, China CDC activated Level I health emergency response – the highest-level public health emergency response that is activated only when an extraordinarily severe public health emergency occurs in China pursuant to China's Emergency Response Law and the National Emergency Plan for Public Health Emergencies – in response to Covid-19.[1] When the Level I health emergency response is activated, Chines central government sends medical teams and other experts to the health emergency region. The governments for the provinces and municipalities where the health emergency occurred should carry out the public health rescues pursuant to the orders from the Chinese central government.

---

[1]According to the National Emergency Plan for Public Health Emergencies, extraordinarily severe public health emergencies primarily include:

    (1)    Pneumonic plague or pulmonary anthrax that has occurred in large and medium-sized cities and has a tendency to spread, or pneumonic plague or pulmonary anthrax has spread to more than 2 provinces and has a tendency to spread further.

    (2)    Infectious atypical pneumonia, human infection with highly pathogenic avian influenza cases with a tendency to spread.

    (3)    Massive diseases of unknown origin involving multiple provinces, with a tendency to spread.

    (4)    The occurrence or introduction of new infectious diseases or infectious diseases that have not yet been discovered in China, and there is a tendency to spread, or that an infectious disease that has been eliminated in China has reoccurred.

    (5)    Loss of virulent strains, virus strains, pathogenic factors, etc.

    (6)    An event that has caused a major epidemic of an infectious disease in the surrounding areas and countries and regions that are open to China, and the existence of imported cases, which seriously endangers China's public health safety.

    (7)    Other extraordinarily severe public health emergencies recognized by the health administration of the State Council.

81.     On January 15, 2020, the Japanese Ministry of Health, Labor and Welfare informed WHO of a confirmed Covid-19 case in a person who travelled to Wuhan. This was the second confirmed case detected outside of China. WHO stated that considering global travel patterns, additional cases in other countries were likely.

82.     On January 15, 2020, the U.S. Embassy in Beijing issued an advisory to those traveling to or from Wuhan, warning about the Covid-19 outbreak in Wuhan and instructing travelers to take health precautions and seek medical attention if symptomatic or sick; it reissued that advisory on January 17 and 18, 2020.

83.     On January 16, 2020, the Pan American Health Organization/WHO Regional office for the Americas (PAHO/AMRO) issued its first epidemiological alert on Covid-19.

84.     On January 17, 2020—the day Defendants priced the Offering—the U.S., at the direction of the Centers for Disease Control and Prevention ("U.S. CDC") and the Department of Homeland Security's Customs and Border Protection, implemented coronavirus entry screening at three airports that received the most travelers in the U.S. from Wuhan: San Francisco (SFO), New York (JFK), and Los Angeles (LAX) airports.

85.     By the time of the IPO, therefore, businesses operating in China, like Lizhi, were uniquely situated to recognize the then-existing impact the coronavirus was having on their business and operations, and the serious, foreseeable threat the coronavirus continued to pose to their future financial condition and operations.

86.     In mid-January 2020, enhanced surveillance and entry screening at various transport hubs resulted in the detection of suspected cases in Hong Kong, Macau, Singapore, South Korea, Taiwan, Thailand and Japan.

### *Material Omissions in Lizhi's Registration Statement*

87.     On August 6, 2019, Lizhi filed with the SEC a confidential draft registration statement on Form F-1, which, incorporating and in combination with related documents on Form F-6, and filed pursuant to Rule 424(b)(4), would be used for the IPO following a series of amendments in response to SEC comments. The SEC provided comments emphasizing the importance of adequately disclosing material trends and risk factors, as required by Items 303 and 105.

88.     Following subsequent amendments, the registration statement was declared effective on January 16, 2020 (the "Registration Statement"). Thereafter, on January 17, 2020, Lizhi filed a prospectus for the IPO on Form 424B4, which incorporated and formed part of the Registration Statement (the "Prospectus" and with the Registration Statement, the "Registration Statement").

89.     The Registration Statement was used to sell to the investing public more than 4.1 million Lizhi ADSs at $11.00 per ADS. Defendants generated approximately $45 million in gross offering proceeds from their sale of Lizhi's securities in the IPO.

90.     The Registration Statement used to effectuate Lizhi's IPO and secure this enormous sum for Defendants from Plaintiff and the Class were negligently prepared and, as a result, omitted to state other facts necessary to make the statements made therein not misleading. Specifically, the Registration Statement failed to disclose Lizhi's direct and escalating exposure to the devastating Covid-19 epidemic, then already raging in China and engulfing its business, customers, and employees at the time of the IPO.

91.     The Registration Statement, signed by the Individual Defendants, misrepresented Lizhi's direct and escalating exposure to the devastating coronavirus epidemic already

proliferating through China, which was impacting the Company's business, customers, and employees at the time of the IPO. For example, the Registration Statement stated as follows:

> ***We face risks related to natural disasters, health epidemics and other outbreaks, which could significantly disrupt our operations.***
>
> We ***may*** be subject to social and natural catastrophic events that are beyond our control, such as natural disasters, health epidemics, riots, political and military upheavals and other outbreaks in the country or region where we have our operations or where a portion of our users or podcasts are located. ***Such events could significantly disrupt our operations and negatively impact our business, financial conditions and development.***

(Emphasis added.)

92.     The statements referenced above was materially misleading because they failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants failed to disclose that: (1) at the time of the IPO, the Covid-19 epidemic was already ravaging China, the home base, principal market, and significant hub for Lizhi, its employees, and its customers; (2) the complications associated with the Covid-19 epidemic were already negatively affecting Lizhi's business, as employees and customers contracted the virus, lost employment, or otherwise experienced difficulty in generating, publishing, and monetizing the content critical to Lizhi's platform; (3) even prior to the IPO, Lizhi employees and customers complained of, and to, Lizhi, which harmed the Company's reputation and financial condition and prospects; and (4) as a result, Defendants' public statements were materially false and/or misleading at all relevant times.

93.     China has faced significant outbreaks of sickness in the past, including the 2002/2003 SARS outbreak. Accordingly, Defendants understood the importance of alerting IPO investors to the Company's susceptibility and vulnerability to large-scale health emergencies of the type that had previously afflicted China and disrupted business operations there.

94.     Indeed, by the time of Lizhi's IPO, some local governments in China had warned of the onset and potential spread of the coronavirus and had implemented travel monitoring and issued local advisories; hospital respiratory wards were reaching maximum capacity; infrared thermometers and other monitoring devices at airports, ports, and train stations (*i.e.,* areas of travel departures and arrivals) were installed; and some businesses had already halted operations or closed their facilities at the direction of governmental authorities. Moreover, communication exchanges on social media platforms in China reflected mounting concerns of the onset and proliferation of symptoms of the coronavirus, even before it was identified. Wuhan Lizhi Network Technology Co., Ltd., one of the four main subsidiaries of Lizhi's VIE company[2], is located in Wuhan, the epicenter of the Covid-19.  Its employees had firsthand direct knowledge of the emergency measures that China took to prevent the spread of Covid-19 within Wuhan. Thus, by the time of the IPO, the risks and complications associated with the coronavirus were ***already*** negatively affecting Lizhi's business, as employees and customers contracted the virus, lost employment, or otherwise experienced difficulty in generating, publishing, and monetizing the content critical to Lizhi's platform.

95.     Accordingly, it was materially misleading for the Registration Statement to warn that health epidemics and other outbreaks could adversely impact Lizhi's business without disclosing the Covid-19 epidemic, of which Chinese authorities and other countries and regions

---

[2] "VIEs" refers to variable interest entities. The VIE structure was developed to circumvent Chinese law that foreign ownership in certain Chinese industries is prohibited. Almost every Chinese company listed in the U.S. is listed through a VIE structure. Defendant Lizhi also uses the VIE structure. Lizhi is a holding company that does not directly own any substantive business operations in China. Rather it  operates its business  through its VIE, Guangzhou Lizhi and its subsidiaries. Wuhan Lizhi holds the Internet Culture Operating License and certain trademarks, copyrights and domain names for the Company.

had been taking specific measures to control the spread  and which then threatened to harm the business. By January 16, 2020, at the latest, Lizhi had enough information to know that its China-based employees, customers, and creators were already under siege by Covid-19, and that it was reasonably likely to have a material, adverse effect on the Company's operations and revenues. By warning of a merely hypothetical risk that "health epidemics or other outbreaks" could occur, the Registration Statement failed to apprise investors that the Company was already subject to the potentially devastating effects of the Covid-19 epidemic. Because information about a hypothetical possibility is not nearly as valuable as information about a then-existing condition, investors were unable to adequately assess the value of the shares offered in connection with the IPO, and, thus, purchased their ADS without material information.

96.     Defendants were required to disclose the Covid-19 epidemic in the Registration Statement for at least four independent reasons.

97.     <u>First</u>, SEC Regulation S-K, 17 C.F.R. §229.303 ("Item 303"), demands disclosure of events and uncertainties that are known to management and reasonably likely to have a material impact on a company's operations.[3] For events that have already occurred but whose consequences are uncertain, Item 303 imposes an objective standard demanding disclosure unless the event is not reasonably likely to have a material impact. The Second Circuit has interpreted "reasonabl[e] likely[hood]" to demand something less than that the event more likely than not will have a material impact. *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 121 (2d Cir. 2012) (sufficient that material impact "quite possibl[e]"). Nor need the event actually

---

[3] Item 5(d) of Form 20-F, a form applicable to Lizhi's IPO, "call[s] for the same disclosure as Item 303 of Regulation S-K". *In Re Comm'n Guidance Regarding MD&A of Fin. Condition & Results of Operation*, Release No. 8350 (Dec. 19, 2003) (the "2003 Guidance") available at 2003 WL 22996757, *1 n.1.

come to pass. *Alibaba II*, 718 F. App'x at 23. At the time of the IPO, the Covid-19 epidemic was already ravaging China, and the complications associated with Covid-19 were already negatively affecting Lizhi's business, as employees and customers contracted the virus, lost employment, or otherwise experienced difficulty in generating, publishing, and monetizing the content critical to Lizhi platform. These undisclosed, materially negative events and trends were likely to (and in fact did) materially and adversely affect Lizhi's results and prospects and rendered the disclosed results and trends in the Registration Statement misleading and not indicative of Lizhi's future operating results.

98.     Item 303 further mandates disclosure of a foreign governmental policy, as here China's governmental policies, that "***could*** materially affect, directly or indirectly, [its] operations or investments by United States nationals." 17 C.F.R. § 229.303, *Instructions to paragraph 303(a):*11. At the time of Lizhi's IPO, the Chinese government had already implemented the highest-level public health emergency response in response to a severe epidemic spreading in the country. Chinese President Xi Jinping had already required Chinese governmental officials to control the Covid-19 epidemic. CCTV and Xinhua News Agency, the top-level mouthpieces of Chinese central government also had announced the existence of the viral pneumonia epidemic. But Lizhi failed to discuss the Chinese government's policies on the Covid-19 epidemic in its Registration Statement and how such policies "could materially affect, directly or indirectly, [its] operations or investments by United States nationals", further violating Item 303.

99.     Second, SEC Regulation S-K, 17 C.F.R. §229.105 ("Item 105"), required, in the "Risk Factor" section of the Registration Statement, a discussion of the most significant factors that make the offering risky or speculative, and that each risk factor adequately describe the risk.

Specifically, Item 105 requires a company to "[e]xplain how the risk affects the registrant or the securities being offered" and "[s]et forth each risk factor under a subcaption that adequately describes the risk." Item 3 of Part I of Form F-1 also requires a foreign private issuer, such as the Company, to "[f]urnish the information required" by Item 105. Lizhi's discussions of risk factors did not even mention, much less adequately describe the risk posed by, Lizhi's exposure to the Covid-19 epidemic already ravaging China, the negative impact the epidemic was already having on Lizhi's business, employees, and customers, the other already occurring negative results and trends, and the likely and consequent materially adverse effects on the Company's future results, share price, and prospects.

100.   Third, Defendants' failure to disclose Lizhi's exposure to the coronavirus epidemic already ravaging China, the negative impact the coronavirus epidemic was already having on Lizhi's business, employees, and customers, and other already occurring negative results and trends, as well as the likely and consequent materially adverse effects on the Company's future results, share price, and prospects, rendered false and misleading the Registration Statement's many references to known risks that, "if" occurring "might" or "could" affect the Company. These "risks" had already materialized at the time of the IPO.

101.   Fourth, the Registration Statement's generic boilerplate risk warnings were not meaningful cautionary languages to investors when it failed to specifically address the likely reasonably material impact of the Covid-19 epidemic on Lizhi's future business.

102.   Investors could not rely on any outside information or media reports to be adequately apprised of the epidemic's impact on Lizhi's business because Defendants' specifically warned investors to not rely on any information outside Lizhi's Registration Statement. It stated that "We have not authorized anyone to provide any information other than that contained in this

prospectus or in any free writing prospectus prepared by or on behalf of us or to which we may have referred you. We take no responsibility for, and can provide no assurance as to the reliability of, any other information that others may give you. We and the underwriters have not authorized any other person to provide you with different or additional information. … You should assume that the information appearing in this prospectus is true, complete and accurate only as of the date of this prospectus." Defendants' risk disclosures (or non-disclosures) of Covid-19 were everything but "true, complete and accurate".

103.     Nonetheless, Defendants went forward with the IPO with the foregoing omissions in the Registration Statement. The IPO was extremely lucrative for Defendants, who raised approximately $45 million in gross proceeds.

## THE TRUTH EMERGES

104.     On March 12, 2020, Defendants filed a Form 6-K report ("Form 6-K Report"), admitting that the Company had already been impacted by the COVID-19 pandemic, stating in relevant part:

> Recently there was a novel coronavirus outbreak in China, known as COVID-19, which soon spread throughout China and in certain other countries. The COVID-19 outbreak has brought uncertainties and interruptions to China's macroeconomics and may have adverse effects on our operations. The Chinese government has taken various measures to constrain the outbreak. ***This COVID-19 outbreak has caused, and may continue to cause, companies in China, including us, to implement temporary adjustment of work schemes allowing employees to work from home.*** LIZHI prioritizes the health and safety of its employees, and has taken various preventative and quarantine measures across the Company soon after the outbreak. As a result of the COVID-19 outbreak, our normal work schedule and results of operations may be adversely impacted, and our revenues for this period may be difficult to predict. With offline activities in China largely limited since early 2020 and many communities subject to temporary lockdown, travel restriction or other form of quarantine . . . ***The extent to which COVID-19 impacts our results will depend on future developments, which are highly uncertain and cannot be predicted, including new information which may emerge concerning the severity of COVID-19 and the actions to contain or treat its impact, among others.***

(Emphasis added.)

105.    Following the Form 6-K Report, Lizhi ADSs fell $2.65/ADS from the previous closing price $8.8, or over 30.11%, to close at $6.15/ADS on March 12, 2020, damaging investors.

106.    On April 20, 2020, after the close of the trading day, Lizhi filed a Form 20-F annual report for the fiscal year of 2019 filed with the SEC. In the Form 20-F, Defendants further admitted that before the IPO, indeed as early as "late 2019," the COVID-19 pandemic was already negatively impacting its business. In relevant part, Defendants stated:

**In late 2019, COVID-19, a novel strain of coronavirus, has spread worldwide.** The COVID-19 outbreak has brought uncertainties and interruptions to China's macroeconomics and the global economy and may adversely affect our business and financial performance in 2020.

\*          \*          \*

**We face risks related to the outbreak of COVID-19.**

COVID-19, a novel strain of coronavirus, has spread worldwide. The COVID-19 outbreak has brought uncertainties and interruptions to China's macroeconomics and the global economy and may have adverse effects on our operations. The Chinese government as well as an increasing number of countries in the world have taken various measures to constrain the outbreak. This COVID-19 outbreak has caused, and may continue to cause, companies in China, including us, to implement temporary adjustment of work schemes allowing employees to work from home. We prioritize the health and safety of our employees, and have taken various preventative and quarantine measures across the Company soon after the outbreak. **As a result of the COVID-19 outbreak, our normal work schedule and results of operations may be adversely impacted, and our revenues for this period may be difficult to predict.** [. . .] **In addition, the disposable income of certain of our users may decrease or have decreased as a result of the impact of the COVID-19 outbreak, which may also adversely affect our performance. The extent to which COVID-19 impacts our results will depend on future developments**, which are highly uncertain and cannot be predicted, including new information which may emerge concerning the severity of COVID-19 and the actions to contain or treat its impact, among others.

\*          \*          \*

**[I]f the impact of the COVID-19 and volatility in the financial markets continue, our financing activities in future to raise additional capital may be materially and adversely affected**, which may in turn have an adverse effect on our ability to meet our working capital requirement and our liquidity.

Any of these factors may result in large and sudden changes in the volume and price at which our ADSs will trade. In particular, ***since the COVID-19 outbreaks,***

***concerns over the economic slowdown resulting from the COVID-19 have led to a significant decrease in the major indices of the U.S. capital markets and an increase in the market volatility, which have, and may continue to have, adversely affected the market price of our ADSs.***

(Emphasis added.)

107.    Upon the issue of the Form 20-F, Lizhi's stock price suffered an additional 6.12% decline to close at $4.91/ADS on the next trading day, further damaging investors. By the commencement of this action, Lizhi shares are trading below $4 per share, a decline of over 63% from the offering price.

108.    As a result of Defendants' omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

109.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired Lizhi ADSs in its IPO or purchased ADSs thereafter in the stock market pursuant and/or traceable to the Company's Registration Statement issued in connection with the IPO and were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company, members of the Individual Defendants' immediate families, legal representatives, heirs, successors or assigns and any entity in which the officers and directors of the Company have or had a controlling interest.

110.    The members of the Class are so numerous that joinder of all members is impracticable. There were over 4.1 million shares sold in the IPO. Since the IPO, the Company's securities have actively traded on NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery,

Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Lizhi or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

111.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

112.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

113.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual members of the Class that would establish incompatible standards of conduct for the party opposing the Class.

114.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.    Whether the Securities Act was violated by Defendants as alleged herein;

b.    Whether the Registration Statement were negligently prepared and contained materially misleading statements and/or omitted material information required to be stated therein;

c.    the extent to which members of the Class have sustained damages and the proper measure of damages

      d.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

115.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**<u>FIRST CAUSE OF ACTION</u>**
Violation of Section 11 of The Securities Act
Against All Defendants

116.    Plaintiff repeats and incorporates each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct.

117.    This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against Defendants.

118.    The Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

119.    Lizhi is the registrant for the IPO. Defendants named herein were responsible for the contents and dissemination of the Registration Statement.

120.    As issuer of the shares, Lizhi is strictly liable to Plaintiff and the Class for the misstatements and omissions.

121.    None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

122.    By reasons of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated Section 11 of the Securities Act.

123.    Plaintiff acquired shares of Lizhi's ADSs pursuant and/or traceable to the Registration Statement for the IPO.

124.    Plaintiff and the Class have sustained damages. The value of Lizhi ADSs has declined substantially subsequent to and due to Defendants' violations.

**<u>SECOND CAUSE OF ACTION</u>**
Violation of Section 15 of the Securities Act
Against Individual Defendants and Cogency Global

125.    Plaintiff repeats and incorporates each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct.

126.    This count is asserted against the Individual Defendants and is based upon Section 15 of the Securities Act.

127.    The Individual Defendants were each control persons of Lizhi by virtue of their positions as directors, senior officers, major shareholders and/or authorized representatives of Lizhi. Individual Defendants had the power and influence and exercised the same to cause Lizhi to engage in the acts described herein. The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of Lizhi.

128.     Lizhi and the Individual Defendants were culpable participants in the violations of §§11 and 12(a)(2) of the Securities Act as alleged above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process which allowed the IPO to be successfully completed.

129.     This claim is brought within one year after discovery of the untrue statements and/or omissions in the Offering that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Offering. It is therefore timely.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Such other and further relief as the Court may deem just and proper.

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiff hereby demands a trial by jury.

Dated:  August 7, 2021

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: <u>/s/ Phillip Kim</u>
Phillip Kim, Esq.
Laurence M. Rosen, Esq.
Jing Chen, Esq.
275 Madison Ave., 40th Floor
New York, NY 10016
Tel: (212) 686-1060
Fax: (212) 202-3827
Emails: pkim@rosenlegal.com
lrosen@rosenlegal.com
 jchen@rosenlegal.com

*Counsel for Lead Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 7th day of August 2021, a true and correct copy of the foregoing AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS was served by CM/ECF to the parties registered to the Court's CM/ECF system.

/s/ Phillip Kim
Phillip Kim