# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

KATHERINE WANDEL, Individually and on
Behalf of All Others Similarly Situated,

                             *Plaintiff,*

                    -*against*-

JING GAO, DEREK BOYANG SHEN, YAN CUI,
WENBIAO LI, ERHAI LIU, XIAN CHEN,
WILLIAM WANG, GANG JI, EDWIN FUNG,
JIANPING YE, JASON ZHENG ZHANG,
CITIGROUP GLOBAL MARKETS INC.,
CREDIT SUISSE SECURITIES (USA) LLC,
J.P. MORGAN SECURITIES LLC, TIGER
BROKERS (NZ) LIMITED, US TIGER
SECURITIES, INC., COGENCY GLOBAL INC.,
RICHARD ARTHUR and PHOENIX TREE
HOLDINGS LIMITED,

                          *Defendants.*

-------------------------------------------------------------x

1:20-cv-03259 (PAC)

**ORDER & OPINION**

This securities case is brought by shareholders of Phoenix Tree Holdings, Limited ("Phoenix Tree" or the "Company"), a residential rental company based in China and with operations in Wuhan. In January 2020—on the cusp of the coronavirus pandemic—Phoenix Tree conducted an Initial Public Offering ("IPO") on the New York Stock Exchange. Plaintiffs allege the IPO documents misled investors about the effect of the pandemic, as well as other financial woes, on the Company's business.

Although many of the defendants (including the Company itself) are not active in this case,[1] two groups of defendants—the Underwriter Defendants and the Cogency Defendants—have moved to dismiss.[2]  For the reasons stated below, the Court **GRANTS** the motions to dismiss without prejudice and with leave to amend.

<u>**BACKGROUND**</u>

The following factual allegations are taken from the Amended Complaint ("AC"), ECF No. 32, as well as statements incorporated by reference to the Amended Complaint and public disclosure documents filed with the Securities and Exchange Commission ("SEC").  *See Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 462 (2d Cir. 2019).[3]  The Court presumes these allegations are true for purposes of these motions to dismiss.  *See id.*

I.  **Phoenix Tree's Business**

Phoenix Tree is a Cayman Islands company that manages and leases apartments in China. AC ¶¶ 2, 14, 32.  These apartments are primarily "co-living platforms" where multiple tenants rent individual rooms while sharing common areas such as kitchens and bathrooms.  *Id.* ¶¶ 33, 36, 38.  Phoenix Tree does not own the apartments; rather, it leases them from property owners on a long-term basis, relying on outside financing and advance payments from tenants.  *Id.* ¶ 44.

---

[1] Phoenix Tree's original counsel withdrew from this case; new counsel for the Company have yet to appear.  *See* ECF No. 47.  Nor have any of the Director or Officer Defendants appeared.  A certificate of default was granted against Defendant Wenbiao Li after he was allegedly served with process, but the Court later vacated that default after finding service was defective.  *See* ECF No. 81.

[2] The Underwriter Defendants are, collectively, Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC, J.P. Morgan Securities LLC, Tiger Brokers (NZ) Limited, and US Tiger Securities, Inc.  The Cogency Defendants are, collectively, Cogency Global Inc. and Richard Arthur.

[3] Unless otherwise indicated, in quoting cases all internal quotation marks, alterations, emphases, footnotes, and citations are omitted.

It then generates revenue from tenant rents and service fees.  *Id.* ¶ 40.  Phoenix Tree's described

this triangle-like financing arrangement to investors in the following way:

> We provide flexible payment options to our residents . . . .  They may choose to prepay rent on an annual, semi-annual or quarterly basis.  We also cooperate with licensed financial institutions that offer rent financing to them.  Once a resident opts for rent financing, we will connect the resident with a financing institution we cooperate with.  The financial institution will perform a credit assessment on the resident, and if approved, will communicate financing terms and enter into financing agreements with the resident.  To ensure proper use of the funds, the financial institutions will make upfront payment to us, and the residents will pay back the loan to the financial institutions in monthly installments. . . .  In the event of the early termination of a resident's lease or a resident's default on repayment of monthly installments, we are required to return the upfront payment for the remaining lease term to the relevant financial institution.

Decl. of Adam J. Goldstein, ECF No. 58 ("Goldstein Decl."), Ex. 1 (the "Registration

Statement/Prospectus") at ECF pagination 85.

By September 2019, Phoenix Tree operated over 400,000 apartment units in thirteen

Chinese cities.  AC ¶ 36.  Just three months later, that number had increased by over 38,000

units.  *Id.* ¶ 36.  Phoenix Tree operated in Wuhan, "where a portion of its 5,000-plus employees

worked."  *Id.* ¶ 3; *see also id.* ¶ 128 (referring to Wuhan as "a significant operational hub for the

Company's business").  Wuhan was the sixth city that Phoenix Tree offered apartment units in.

*Id.* ¶ 66.  Although the Company had entered the Wuhan apartment market by the end of 2017, it

is not clear from the Amended Complaint how many apartments Phoenix Tree controlled in that

city.  *See id.* ¶ 37.

## II.     The IPO Process

Phoenix Tree conducted an IPO on the New York Stock Exchange in January 2020, after beginning the process in August 2019. AC ¶ 52. The SEC declared Phoenix Tree's registration statement to be effective on January 16, 2020. *Id.* ¶ 63. The next day, the Company filed its final prospectus, which incorporated the registration statement (together, the "Offering Documents"). *Id.* ¶ 64. It continued to amend the Offering Documents until the day before the SEC declared them effective. *Id.* ¶ 59.

As is typical, the Offering Documents provided a rosy outlook on the Company. Phoenix Tree touted its "big data platform," which the Company employed to analyze a "vast amount of internally-generated data from [its] day-to-day operations, as well as additional rental market-related data and demographic data from public and third-party sources." AC ¶¶ 45–46. The Offering Documents also highlighted the strong demand and "enormous growth potential for co-living platforms in China." *Id.* ¶¶ 49–50.

Phoenix Tree's IPO opened on January 17, 2020—the same day the Offering Documents were issued in full. AC ¶ 63. That morning, Phoenix Tree executives rang the New York Stock Exchange's opening bell after arriving from China. *Id.* ¶ 27. Phoenix Tree ultimately sold 9.6 million American Depositary Shares ("ADS") during the IPO, which closed five days later on January 22, 2020. *Id.* ¶¶ 1, 14, 34, 64. At the price of $13.50 per share, the Company made approximately $128.4 million from the IPO. *Id.* ¶ 64.

Both Plaintiffs in this case purchased their Phoenix Tree ADS on January 17, 2020: the first day of the IPO. AC ¶ 13.

### III.   Alleged Omissions in the Offering Documents

Plaintiffs have identified four sets of allegedly misleading omissions from the Offering Documents.

#### A.  Coronavirus Risks

The Offering Documents included a "risk factor" that Phoenix Tree's "business could [] be adversely affected by the effects of Ebola virus disease, H1N1 flu, H7N9 flu, avian flu, Severe Acute Respiratory Syndrome, or SARS, or other epidemics," noting that "operations could be disrupted" if employees were infected and financial performance could decline if the Chinese economy was affected.  AC ¶ 125.  The Offering Documents failed to refer specifically to COVID-19.  *Id.* ¶¶ 128, 131.

That omission is central to Plaintiffs' claims.  They allege that by January 16, 2020 (when the Offering Documents became effective) and "certainly by January 22, 2020" (when the IPO ended), Phoenix Tree "had enough information to know that China—and Wuhan, in particular—was already under siege by the coronavirus, and that it was reasonably likely to have a material adverse effect on the Company's operations and revenues."  AC ¶¶ 128–29.  In support of this claim, the Amended Complaint presents a timeline of the pandemic in January 2020, including the onset of international travel restrictions and advisories in Taiwan, Hong Kong, and the United States Embassy in Beijing, *see id.* ¶¶ 69, 71–81, 83, and domestic controls in Wuhan, *see id.* ¶¶ 84–85, 90, 92.  For example, by January 12, "local hospital respiratory wards" in Wuhan "were already reaching maximum capacity." *Id.* ¶ 86.  By January 16, Chinese health officials had confirmed 41 cases of the new virus.  *See* Goldstein Decl., Ex. 15, Wang Xiaodong, *Wuhan Intensifies Monitoring of Virus*, CHINA DAILY GLOBAL (Jan. 16, 2020); *see also COVID-19 and China: A Chronology of Events (December 2019-January 2020)*, CONG.

RES. SERV. 30 (last updated May 13, 2020), https://crsreports.congress.gov/product/pdf/r/r46354 (providing the same statistic of 41 cases, and noting that Wuhan authorities had not reported any new cases in two weeks).[4]  Human-to-human transmission had not yet been confirmed.  *See id.*  But by January 20, there were "over 280 reported coronavirus cases, with 278 in China—258 of which were from Wuhan alone."  AC ¶ 89.

In the immediate days after the IPO ended on January 22, the coronavirus situation in China escalated dramatically.  On January 22, China announced it would place the 11 million residents of Wuhan on lockdown the next day.  AC ¶¶ 93, 127.  On January 23, China increased the lockdown to encompass the larger region around Wuhan, bringing the total number of people subject to the lockdown to 25 million.  *Id.* ¶ 94.  A travel ban on January 24 affected 41 million people and prompted Lunar New Year celebrations to be cancelled.  *Id.* ¶ 95.  About one week after the IPO ended, China had reported over 10,000 cases of COVID-19.  *Id.* ¶ 96.  By January 30, the World Health Organization had announced a global health emergency.[5]

---

[4] The Court may take judicial notice of these sources.  Although the Court is generally wary of relying on documents that the Amended Complaint does not reference, "it is appropriate to take news articles into account even on a Rule 12(b)(6) motion."  *421-A Tenants Ass'n, Inc. v. 125 Ct. St. LLC*, 760 F. App'x 44, 49 (2d Cir. 2019) (citing *Staehr v. Hartford Fin. Servs. Grp.*, 547 F.3d 406, 427−33 (2d Cir. 2008)).  Similarly, "The Court may take judicial notice of information available on government websites."  *Murway v. Blinken*, No. 21-cv-1618 (RJL), 2022 WL 493082, at *3 (D.D.C. Feb. 16, 2022) (taking judicial notice of State Department COVID-19 statistics).

The Court relies on these sources to discern how the clearest measure of the COVID-19 threat— case counts—was publicly reported during the period in question.  Although the Amended Complaint provides case counts on some dates, it omits them for the critical days leading up to the IPO.  And it is fair to rely on this article when Plaintiffs contend that Phoenix Tree should have been aware of such Chinese news reports given the Company's presence in China.  *See* AC ¶ 65; *Green v. City of Mount Vernon*, 96 F. Supp. 3d 263, 283 (S.D.N.Y. 2015) ("When considering whether a plaintiff relies on the document in framing the complaint, it is sufficient if the complaint relies heavily, albeit implicitly, upon the document's terms and effect.").

[5] The Court takes judicial notice of this announcement.  *See United States v. Valenta*, No. CR 15- 161, 2020 WL 1689786, at *1 (W.D. Pa. Apr. 7, 2020).

The pandemic, of course, ended up having a major effect on Phoenix Tree's business. In post-IPO filings in March and April 2020, the Company revised its "Recent Developments" section to "extensively" describe the impact of the pandemic and "update[e] its risk factors to address the virus." AC ¶¶ 105, 107–110. Over the first quarter of 2020, operating expenses increased, in part because of the early termination of rental leases due to COVID-19. *Id.* ¶ 111.

### B. Rise in Renter Complaints

Plaintiffs' remaining allegations allege earlier problems with Phoenix Tree's business in the fourth quarter of 2019.

Plaintiffs claim that Phoenix Tree failed to disclose a swelling tide of complaints from renters. The Offering Documents acknowledged that "claims in the ordinary course of our business," including "complaints made by our residents . . . [,] could substantially damage our reputation, even if they are baseless or fully addressed." AC ¶ 136. They also provided a more generalized warning about reputational risks, including from renter complaints:

> Our brand and reputation are vulnerable to many threats that can be difficult or impossible to control, and costly or impossible to remediate. Regulatory inquiries or investigations, lawsuits and other claims in the ordinary course of our business, perceptions of conflicts of interest, complaints made by our residents and market rumors, among other things, could substantially damage our reputation, even if they are baseless or fully addressed.

Registration Statement/Prospectus at ECF p. 25.

The Offering Documents also disclosed a satisfaction survey from August 2019, which noted a "70%+ Recommendation rate" by Phoenix Tree customers. *Id.* at ECF pp. 4, 8. Despite this statistic, Plaintiffs contend that Phoenix Tree "engaged in the questionable practice" of requiring many tenants to pay hefty rental costs up-front, and even coaxing them into taking out long-term loans to do so. AC ¶ 116. Those practices created risks for Phoenix Tree, who could

be responsible for missed payments if its renters defaulted. *Id.* Phoenix Tree had received complaints about these practices before the IPO. *Id.* ¶¶ 117, 137.

Renter complaints increased after the IPO ended, however, as Phoenix Tree faced "the combined effects of substantial weakening in its business and the coronavirus." AC ¶ 117.

### C. "Softening" of Financial Results from Returned Upfront Payments

Plaintiffs also assert Phoenix Tree omitted an aspect of its financial performance from the fourth quarter of 2019. The Offering Documents provided "selected unaudited financial data for October 2019 and certain operating data for October or November 2019." *See* AC ¶¶ 5, 56, 58–59, 63. The Company "acknowledged the importance of providing updated information," but also noted that the fourth quarter of 2019 had concluded only two weeks before the IPO, so future financial adjustments were still possible. *Id.* ¶¶ 56, 142. The Company explained that it had included preliminary data from October and November 2019 to provide "the most current information that [the Company is] able to provide under the time constraints." *Id.*

The financial data from the first three quarters of 2019 showed how Phoenix Tree had returned more and more upfront payments to lenders as the Company grew in 2019. *See* AC ¶¶ 42, 106, 143. However, the preliminary data from the most recent fourth quarter did not include an abnormal rise in early lease terminations and defaults, which were only revealed in financial reports after the IPO had ended. *Id.* ¶¶ 98–102. Plaintiffs allege that the rise in tenant terminations and defaults required the Company, under its triangle-structured financing system, to refund more payments to its lenders than usual. *Id.* ¶¶ 143–145. Indeed, the Company had been forced to return "almost the entirety of upfront payments it had received from financial institutions" during the fourth quarter of 2019. *Id.* ¶ 106.

8

Although Phoenix Tree did not include this quarterly refund statistic in the Offering Documents, it gave several paragraphs' worth of descriptions and warnings about the consequences that early lease terminations and defaults could have on its business. One such paragraph included the following warning, in bold and italics:

> *If our residents . . . seek early termination of their leases or fail to meet their obligations under their leases, our business, results of operations and financial condition may be materially and adversely affected.*

Registration Statement/Prospectus at ECF p. 25 (emphasis in original); *see also id.* at 26 (further describing risks regarding tenant financing).

### D.  Changes to Sales and Marketing Strategies

Finally, the Offering Documents noted that Phoenix Tree had "adjusted [its] sales and marketing strategies in the fourth quarter of 2019," leading to a decline in apartment occupancy. AC ¶ 139.  The Company explained that those strategic changes were implemented because the Company "believe[d]" they would "improve our sales and marketing efficiency in the long run." *Id.*

However, because Phoenix Tree employed a wide range of strategies, Plaintiffs allege the Offering Documents did not "disclose *the manner in which* the Company changed its sales and marketing practices shortly before the IPO, nor did they disclose how any such changes adversely impacted occupancy."  AC ¶¶ 139–40 (emphasis added).

### IV.    Procedural History

Plaintiff Katherine Wandel filed a complaint in April 2020 against Phoenix Tree, its officers and directors, the Underwriter Defendants, and the Cogency Defendants.  The Court subsequently named Gerard L. Kirkpatrick as Lead Plaintiff.  *See* ECF No. 25.  The two Plaintiffs, Wandel and Kirkpatrick, purport to bring their claims "on behalf of a class consisting

9

of all persons or entities who purchased Phoenix ADS pursuant and/or traceable to the Offering Materials." AC ¶ 162. Plaintiffs allege that the value of their ADS declined after the IPO as information "emerged concerning the impact of the coronavirus and other issues" on Phoenix Tree. *Id.* ¶ 122. A class period is not alleged in the Amended Complaint.

The Amended Complaint alleges three counts, all violations of the Securities Act of 1933. Count I alleges all defendants violated Section 11. *See* AC ¶¶ 168–177; 15 U.S.C. § 77k. Count II alleges all defendants violated Section 12(a)(2). *See* AC ¶¶ 178–185; 15 U.S.C. § 77l(a)(2). Count III alleges violations of Section 15 by Phoenix Tree, its officers and directors, Tiger Brokers (NZ) Limited, and the Cogency Defendants. *See* AC ¶¶ 186–192; 15 U.S.C. § 77o.

In the other Defendants' absence, the Underwriter Defendants and the Cogency Defendants have moved to dismiss. The Underwriter Defendants are alleged to have "underwr[itten] the IPO, solicited purchasers of the ADS, and/or sold the ADS, in exchange for which they received millions of dollars in fees and commissions." AC ¶ 28. They are also alleged to have helped draft and disseminate the Offering Documents. *Id.* ¶ 31. As for the Cogency Defendants, Cogency Global was Phoenix Tree's authorized IPO representative in the United States, and Mr. Arthur signed the Offering Documents as a Cogency Global employee. *Id.* ¶ 26.

## DISCUSSION

### V.   Legal Standard

To defeat a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is facially plausible

"when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The Court draws all inferences in favor of the plaintiff(s) as the nonmoving party. *See Sanderson Farms*, 944 F.3d at 462.

Section 11 of the Securities Act imposes strict liability on issuers and signatories, and negligence liability on underwriters, where "any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). Section 12(a)(2) imposes similar liability for a prospectus. *See id.* § 77l(a)(2). Given their "roughly parallel elements," "[c]laims under Sections 11 and 12 are usually evaluated in tandem because if a plaintiff fails to plead a cognizable Section 11 claim, he or she will be unable to plead one under Section 12(a)." *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 368 (S.D.N.Y. 2011). The Court reviews these claims under the typical *Iqbal* pleading standard, described above, rather than under the heightened particularly standard of Federal Rule of Civil Procedure 9(b) for cases where fraud is alleged. *See In re Lehman Bros. Mortgage-Backed Sec. Litig.*, 650 F.3d 167, 174 (2d Cir. 2011).

"Collectively, the language of sections 11 and 12(a)(2) creates three potential bases for liability based on registration statements and prospectuses filed with the SEC: (1) a misrepresentation; (2) an omission in contravention of an affirmative legal disclosure obligation; and (3) an omission of information that is necessary to prevent existing disclosures from being misleading." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010). Thus, Plaintiffs here must adequately allege that Phoenix Tree's IPO Offering Documents contained a material misstatement or omission. *See Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983).

To determine whether the Offering Documents would mislead a reasonable investor, the Court must consider them "holistically," rather than by cherry-picking individual statements. *Morgan Stanley*, 592 F.3d at 365–66. The complaint need not allege the issuer acted with any intent to deceive or defraud. *See New Jersey Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*, 709 F.3d 109, 120 (2d Cir. 2013). Nor do plaintiffs need to have relied on the allegedly misleading statements to state a claim. *See id.*

"[A] corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact. Rather, an omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts." *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993). For claims under Sections 11 and 12(a)(2), the duty to disclose arises only when the issuer knew—or should have known—of the omitted fact at the time the statements were made. *See In re HEXO Corp. Sec. Litig.*, 524 F. Supp. 3d 283, 300 (S.D.N.Y. 2021). Clairvoyance is not required. *See Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000).

## VI.     Plaintiffs' Section 11 Claims

The essence of Plaintiffs' Section 11 claims is that the Offering Documents "omitted or otherwise misrepresented the nature" of four problems for Phoenix Tree: (1) the "Company's exposure to significant adverse developments resulting from the onset of the coronavirus in China—particularly in Wuhan—at the time of the IPO"; (2) the "level of renter complaints the Company had received before and as of the IPO"; and (3) the "downward trending occupancy rates and softening demand in China's residential rental market"; and (4) details about changes to the Company's sales and marketing strategies. AC ¶ 2.

12

Whether refuted by the language in the Offering Documents, the facts alleged in the Amended Complaint itself, or both, Plaintiffs "have not nudged" these Section 11 omission theories "across the line from conceivable to plausible" in order to state a valid claim. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The Court analyzes the defects of the four allegations' in turn.

### A. Coronavirus Risks

The Court begins with Plaintiffs' principal contention: that Phoenix Tree had a duty to disclose what it knew about COVID-19. Because an issuer's statement cannot be rendered misleading by events arising *after* that statement is made, the Court must determine the proper cutoff date of Phoenix Tree's duty to disclose what it knew about the risks it faced from the coronavirus in China. That date was January 17, 2020—the date Phoenix Tree filed its Offering Documents (the final prospectus and the incorporated registration statement). *See, e.g.*, *In re Agria Corp. Sec. Litig.*, 672 F. Supp. 2d 520, 526 (S.D.N.Y. 2009) ("The truth of a statement made in the prospectus is adjudged by the facts as they existed when the registration statement became effective."). Plaintiffs, however, maintain that the Company's duty to update the Offering Documents extended until January 22, under a SEC regulation that requires an issuer to update a prospectus with any major developments within five business days after the Offering Documents are declared effective. *See* 17 C.F.R. §230.424(b)(3); *see also SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1095 (2d Cir. 1972) ("Post-effective developments which materially alter the picture presented in the registration statement must be brought to the attention of public investors.").

Yet even assuming Phoenix Tree had a continuing duty to update the Offering Documents, that duty with respect to Plaintiffs was extinguished by Plaintiffs' own purchase

decisions. That is because the Court assesses the accuracy of the Offering Documents based on the date the plaintiff purchased the security. *See Akerman v. Oryx Commc'ns, Inc.*, 810 F.2d 336, 340 (2d Cir. 1987) (for Section 11 claims); *In re Alliance Pharm. Corp. Sec. Litig.*, 279 F. Supp. 2d 171, 185 (S.D.N.Y. 2003) (same for Section 12(a)(2) claims). After all, subsequent updates to the Offering Documents would have no bearing on Plaintiffs' already-completed purchase of their ADS, even if the IPO was still ongoing for other potential buyers. Here, both Plaintiffs purchased their ADS on January 17. Therefore, Phoenix Tree had no duty to update its Offering Documents for *these specific plaintiffs* after January 17.[6]

This timing is critical. To state a valid claim under Section 11, Plaintiffs must allege that Phoenix Tree should have been aware *by January 17* that COVID-19 posed material risks to its business. *See Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662, 669 (S.D.N.Y. 2008). The fact that the outbreak escalated rapidly after January 17 is irrelevant unless that escalation had already "transpired" or "was a near certainty" by that point. *Luo v. Sogou*, 465 F. Supp. 3d 393, 411 (S.D.N.Y. 2020).

---

[6] Although Plaintiffs purport to represent a class defined broadly as "all persons or entities who purchased Phoenix ADS pursuant and/or traceable to the Offering Materials," the Amended Complaint includes no specific allegations of any purchases occurring after January 17, 2020. AC ¶ 162. Nor has any plaintiff claiming to have purchased the ADS after January 17 appeared in this action. *See id.* ¶ 13. Thus, because it has not yet been presented with pleadings that invite such a finding, the Court declines to opine as to whether a duty to update the Offering Documents may have arisen at some point after January 17 for other potential plaintiffs. *See In re Checking Acct. Overdraft Litig.*, 780 F.3d 1031, 1037 (11th Cir. 2015) ("[Adjudicating] hypothetical claims that might be raised in the future by hypothetical plaintiffs cannot be regarded as anything but an impermissible 'advisory opinion on an abstract proposition of law.'") (quoting *Hall v. Beals*, 396 U.S. 45, 48 (1969)). Nor would it be appropriate for the Court to allow these specific Plaintiffs, who have failed to state a claim, to continue litigating on behalf of hypothetical later ADS purchasers. *See Kane v. Johns-Manville Corp.*, 843 F.2d 636, 643–44 (2d Cir. 1988) ("Generally, litigants in federal court are barred from asserting the constitutional and statutory rights of others in an effort to obtain relief for injury to themselves.").

In fact, no such escalation had occurred by January 17. To the contrary, the risk of COVID-19 was neither known nor knowable to Phoenix Tree by the start of the IPO. By that date, health officials had identified 41 cases of viral infection—a statistic that "appeared unremarkable at the time." *See Medina v. Tremor Video, Inc.*, 640 Fed. App'x 45, 49 (2d Cir. 2016) ("The . . . complaint does not state facts from which we can infer that defendants knew of the existence or impact of any uncertainty or trend [in the advertising sector] that the rest of the world did not know, and that therefore should have been disclosed."). Nor had any human-to-human transmission been confirmed. It is therefore only with hindsight that Plaintiffs can allege that Phoenix Tree failed to discuss the possibility that a few dozen cases of a respiratory illness would explode into a ruinous pandemic. Such an omission is not actionable. *See Novak*, 216 F.3d at 309 ("[A]llegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud.").

Plaintiffs maintain that Phoenix Tree was in a unique position to recognize the coronavirus threat by January 17 because the Company had apartments and employees in Wuhan itself. Thus, the argument goes, by virtue of its physical location at the origin of the pandemic, Phoenix Tree was supposedly in a different situation than other companies who omitted the coronavirus threat from their IPO documents in January 2020. But this theory is speculative at best. Plaintiffs have not pled any facts about the size or nature of Phoenix Tree's operations in Wuhan, much less facts demonstrating any Wuhan employee's knowledge[7] of the threat posed

_____

[7] On this note, Plaintiffs also argue that Phoenix Tree was in a unique situation to appraise the pandemic vis-à-vis investors because the Company's executives were aware of health advisories while travelling to New York City for the IPO. For example, two days before the IPO, the United States embassy in Beijing had instructed travelers from Wuhan to "take health precautions and seek medical attention if symptomatic or sick." AC ¶ 87.

by COVID-19.  In this vein, another district court dismissed a complaint that failed to allege how a company could have predicted the outbreak of COVID-19 any better than the average person, despite concrete conversations between the company's CEO and a manufacturer in Wuhan occurring on January 25, 2020—three days after Phoenix Tree's IPO had closed.  *See In re Carnival Corp. Sec. Litig.*, No. 1:20-cv-22202-KMM, 2021 WL 2583113, at *11 (S.D. Fla. May 28, 2021).  Phoenix Tree's alleged capabilities from its "big data platform" likewise fail to lend meaningful support to Plaintiffs' claims—the Amended Complaint does not explain how monitoring real-estate developments would give Phoenix Tree "any more insight as to the impact of COVID-19 than the average person." *Id.*

Instead of providing facts specific to Phoenix Tree, Plaintiffs rely on a narrative of public reports to show how COVID-19 cases were growing in Wuhan in January 2020.  But omissions are not actionable "where the truth was fully disclosed or concerned a matter of public knowledge."  *Lau v. Opera Ltd.*, 527 F. Supp. 3d 537, 553 (S.D.N.Y. 2021) (collecting cases).  To be sure, "there are serious limitations" on Phoenix Tree's ability to "charge its stockholders with knowledge of information" outside of the Offering Documents—especially when shareholders were instructed not to rely on outside facts.  *In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 437–38 (S.D.N.Y. 2009).  Nonetheless, the Amended Complaint itself shows how the entire world had tracked COVID-19 since its inception.  This was not an instance where investors only had access to "sporadic press reports or reports published in other contexts" about the virus.  *In re WorldCom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 688 (S.D.N.Y. 2004); *see also*

---

Even assuming the executives traveled from Wuhan itself (which is not alleged), the fact that they knew about these advisories does not create a plausible inference that they knew COVID-19 would present a material threat to their Company in the future.  The "obvious alternative explanation" is that the executives did *not* view the coronavirus as a threat sufficient to disrupt their travel plans. *New Jersey Carpenters*, 709 F.3d at 121.

*Fuwei Films*, 634 F. Supp. 2d at 438 (three newspaper articles published in Chinese did "not transform the information contained within the articles into 'matters of general public knowledge' that may properly be imputed to [issuer's] stockholders"). Instead, both Chinese and "foreign media" had reported on the outbreak, several countries were monitoring potential cases, and the United States embassy itself had issued a travel advisory regarding Wuhan. *See* AC ¶¶ 81–82. And the Amended Complaint is devoid of allegations that Phoenix Tree "possessed some greater knowledge" than the Centers for Disease Control, the World Health Organization, or Chinese authorities "as to the devastation COVID-19 would ultimately cause." *Carnival*, 2021 WL 2583113, at \*17. In short, the Amended Complaint does not plausibly allege that Phoenix Tree knew anything more about COVID-19 than the general public did.

If Plaintiffs and Phoenix Tree were similarly positioned to track the nascent pandemic, then for Phoenix Tree to be liable under the Securities Act, it would have had to possess some special, non-public insight into how these public developments could affect its business. *See Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 718–19 (2d Cir. 2011). But Plaintiffs fail to plausibly allege that by January 17, COVID-19 was materially affecting Phoenix Tree's business in a way that would put the Company on notice about future problems. With only a few dozen cases reported worldwide by January 17, 2020, Phoenix Tree's tenants were not defaulting or renting fewer apartments because of COVID-19. Plaintiffs effectively concede this point, arguing that the "profound impact of the coronavirus on Phoenix's operations became clear to the public *as early as February 2020*, when Phoenix forced landlords to forgo rent payments for 30 days and pledged to return one month's rent to tenants in Wuhan and to offer rent reductions elsewhere." *See* Pls.' Opp'n Mot. Dismiss, ECF No. 75, at 8 (emphasis added). But that would have been weeks after the operative date in this action of January 17. Thus, Phoenix Tree had no

duty to lay out a specific plan to combat the effects of COVID-19 on its business by the date the Plaintiffs in this action actually purchased their Phoenix Tree shares. Plaintiffs' insistence to the contrary—on accounting for the magnitude of risk the outbreak presented—is nothing more than hindsight pleading.[8]

Moreover, the Offering Documents *had* warned investors about the very possibility of a disease outbreak. On January 17, 2020, at worst, the COVID-19 outbreak appeared analogous to an incipient outbreak of its viral cousin, SARS. And to that end, the risk of another SARS-like outbreak in China was disclosed, verbatim, in the "risk factors" section of the Offering Documents, along with four other specific disease variants that had threatened China's economy in the past. *See City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379 (S.D.N.Y. 2020) (cautionary language about financial results was sufficiently specific where statement listed more than ten variables). Phoenix Tree adequately warned about the fundamental effects that a viral epidemic could have on the Company's rental business, even if the COVID-19 variant was not identified by name. *See In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 579 (S.D.N.Y. 2013) ("[W]here there is disclosure that is broad enough to cover a specific risk, the disclosure is not misleading simply because it fails to discuss the specific risk.").

Plaintiffs are certainly correct that generic, forward-looking risk statements cannot absolve an issuer who faces risks that have already transpired. *See, e.g.*, *In re Facebook, Inc., IPO Secs. & Deriv. Litig.*, 986 F. Supp. 2d 487, 515 (S.D.N.Y. 2013). But as discussed above, by January

---

[8] The cases Plaintiffs cite are distinguishable in that they center around risks that were *known* unknowns. *See Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 718–19 (2d Cir. 2011) (requiring disclosure of how existing real estate trends might affect revenues); *Yi Xiang v. Inovalon Holdings, Inc.*, 254 F. Supp. 3d 635, 644 (S.D.N.Y. 2017) (future effect of tax law was unknown, but change in the law had already occurred).

17, 2020, any material risk of COVID-19 had not transpired—or become a near certainty—for Phoenix Tree. *See Berg v. Velocity Fin., Inc.*, No. 2:20-cv-06780-RGK-PLA, 2021 WL 268250, at *10 (C.D. Cal. Jan. 25, 2021) (disclosure about coronavirus not required where plaintiffs had not adequately alleged how issuer "would have known about the coronavirus risks at the time of the IPO to include a more specific warning").    Phoenix Tree's risk statement provides yet another justification why its Offering Documents were not misleading about COVID-19.

All told, this might have been a very different case if Plaintiffs had bought their ADS just a few days or weeks after they did.  In the week after the IPO began, the coronavirus situation literally grew a million-fold: from 41 reported cases to a lockdown of 41 million people.  By then, China had reacted in very visible ways, with a slew of restrictions, guidance, and other response measures.  That exponential growth was exactly why the pandemic caught the world so off guard.  Yet on January 17, 2020, life continued as normal, even in Wuhan.

To be clear, the Court does not reach the issue of whether Phoenix Tree's omission of a COVID-19 disclosure could have been misleading at some point *after* January 17, 2020.  But based on the plaintiffs who brought this case, the Court concludes the risk of the pandemic simply was not reasonably knowable on the date they relied on Phoenix Tree's statements.

### B.  Rise in Renter Complaints

The remaining allegations are largely independent of COVID-19; they instead concern problems with Phoenix Tree that began to simmer in the fourth quarter of 2019.  To start, Plaintiffs contend that renter complaints began to rise during that quarter—and continued to rise after the IPO and the pandemic—but that such complaints were not disclosed in the Offering Documents, making them materially misleading.  These claims are belied by the Offering Documents themselves.

The Offering Documents discussed renter satisfaction (and the risks of dissatisfaction) multiple times. They advertised a 70%+ renter recommendation rate from a survey taken the previous quarter, in August 2019. For "most companies . . . some level of customer discontent is a fact of life," and there is no allegation that renter complaints about nefarious lending practices had affected Phoenix Tree's bottom line at all before the IPO. *In re IAC/InterActiveCorp Sec. Litig.*, 695 F. Supp. 2d 109, 120 (S.D.N.Y. 2010) (quoting *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Companies, Inc.*, 75 F.3d 801, 810 (2d Cir. 1996)).

Because its real gripe is with post-IPO renter complaints, the Amended Complaint shifts gears to claim the rise of renter complaints was "the foreseeable result of practices Phoenix engaged in before the IPO." AC ¶ 118. But the fundamentals of those practices were disclosed to investors at that time. The Offering Documents thoroughly explained—in multiple block paragraphs, with bold italics—the triangle of loan practices between Phoenix Tree, renters, and financial institution lenders.[9]

The Offering Documents provided another safeguard, too. They "warned investors of exactly the risk the plaintiffs claim was not disclosed": the possibility that renter complaints could harm Phoenix Tree's business and reputation after the IPO. *Sogou*, 465 F. Supp. 3d at 411 (quoting *Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 5 (2d Cir. 1996)). No reasonable investor would be left thinking otherwise.

---

[9] The Amended Complaint also attributes renter complaints to Phoenix Tree's "emergency response plans" to COVID-19—which, again, had no reason to exist by January 17, 2020. AC ¶ 118. All told, a sudden rise in renter complaints from the pandemic was not reasonably foreseeable to Phoenix Tree at the time it published the Offering Documents, and was therefore not something it would have to disclose. *See Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 39 (2d Cir. 2012) (affirming dismissal of complaint which had assumed "prescient" executives could "understand[] not only the weaknesses of the services they were offering but also the imminent detrimental effect that those weaknesses would have on the company's stock price once the financial markets collapsed").

### C.  "Softening" of Financial Results from Returned Upfront Payments

Plaintiffs next allege that Phoenix Tree failed to disclose the number of upfront payments it had returned to its lenders during the fourth quarter of 2019.  Plaintiffs do not challenge the preliminary data from that quarter that *was* reported.  *See Boca Raton Firefighters*, 506 Fed. App'x at 38 ("Whatever the scope of the responsibility not to make statements that constitute 'half-truths,' that surely does not apply to the reporting of unmanipulated corporate earnings.").  Rather, Plaintiffs allege that once Phoenix Tree had included some operating and financial metrics from the months of October and November 2019, it had a duty to report that it had returned a greater percentage of upfront payments than usual during that quarter overall.  Otherwise, an investor at the IPO would think that the Company's financial health in the fourth quarter of 2019 had been stronger than it really was.

However, with the fourth quarter having ended just two weeks before the IPO, the Offering Documents clearly warned investors that Phoenix Tree still needed time to assess its financial results during from quarter, and that any data it did report were merely preliminary.  Indeed, in examining another company's IPO whose timing was virtually identical to Phoenix Tree's—as both registration statements became effective on January 16, 2020—a district court found that "relying on data from [the fourth quarter of 2019] may not have been feasible at the effective date because the quarter would have only ended two weeks before, and Defendants would have needed time to audit the data before including it in any public materials."  *Berg*, 2021 WL 268250, at *5 n.1.  Given the timing of its IPO, Phoenix Tree would not yet have had a duty to report financial data from the fourth quarter of 2019—softened or otherwise—in the Offering Documents.

Plaintiffs nevertheless maintain that Phoenix Tree had put the issue of returned upfront payments into play by providing other quarterly data.  But the mere fact that Phoenix Tree eventually revised the financial picture several months after the IPO "does not connote that that the Company's earlier statement about its earnings expectations was false or misleading when made."  *Lopez v. Ctpartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 40–41 (S.D.N.Y. 2016) (initial earnings projection not misleading despite being revised just one week later).  Simply put, "[t]his circumstance does not show that the Company knew, at the time of the preliminary release, what the ultimate earnings data would reveal" about the rate of returned upfront payments.  *Id.*  Moreover, financial data from the previous three quarters—all fully disclosed in the Offering Documents—would have made investors aware that, as a historical trend, Phoenix Tree had returned more and more upfront payments as the Company grew in 2019.  *See DeMaria v. Anderson*, 318 F.3d 170, 180 (2d Cir. 2003).

## D.  Changes to Sales and Marketing Strategies

The final omission that Plaintiffs challenge is the Offering Documents' disclosure, without further elaboration, that Phoenix Tree had changed its sales and marketing strategies in the fourth quarter of 2019, before the IPO.  Plaintiffs contend that, having spoken about changing these strategies generally, Phoenix Tree had a duty to disclose the specific strategy changes rather than leave the description "misleadingly incomplete."  Pls.' Opp'n at 18.  But the actual disclosure did not leave investors with the misleading impression that Phoenix Tree's sales and marketing strategies had remained the same in the fourth quarter of 2019.  Phoenix Tree had no duty to go further than that.  *See Richman v. Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 274 (S.D.N.Y. 2012) ("[R]evealing one fact about a subject does not trigger a duty to reveal all facts on the subject, so long as what was revealed would not be so incomplete as to mislead.").

22

## VII.    Plaintiffs' Claims Under Items 105 and 303 of Regulation S-K

Plaintiffs also argue Phoenix Tree had an independent duty to disclose material changes to its business under Items 105 and 303 of SEC Regulation S-K.[10]  This alternative approach cannot save Plaintiffs' claims, though, as the same deficiencies from their Section 11 arguments carry over to their Regulation S-K arguments.

Item 105, formerly Item 503, requires a disclosure of the "most significant risk factors" associated with the security.  17 C.F.R. § 229.105.  To state a claim under Item 105, an issuer must know, at the time of the IPO, about an undisclosed risk factor that could seriously affect its present or future business.  *See Rubinstein v. Credit Suisse Grp. AG*, 457 F. Supp. 3d 289, 300 (S.D.N.Y. 2020).  Likewise, Item 303 "imposes a disclosure duty where a trend, demand, commitment, event or uncertainty is both [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operations." *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 120 (2d Cir. 2012); 17 C.F.R. § 229.303(a)(1).  Thus, whether for a "risk factor" under Item 105 or "a trend, demand, commitment, event or uncertainty" under Item 303, Plaintiffs must plausibly allege that Phoenix Tree actually knew about, but did not disclose, the matter to investors.

Plaintiffs' assert the opposite: that they need not plead actual knowledge to create an obligation under Items 105 or 303.  That reading is contrary to the regulations' own text and refuted by a long line of authority in this Circuit.  *See, e.g.*, *Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818

---

[10] The SEC interprets Item 5 of Form 20-F, which imposes disclosure requirements on foreign issuers such as Phoenix Tree, as "calling for the same disclosure as Item 303 of Regulation S-K." *Interpretation: Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations*, SEC Release Nos. 33-8350; 34-38960; FR-72, available at https://sec.gov/rules/interp/33-8350.htm#P18_1728.

Similarly, Item 3 of Form F-1 regulates foreign issuers' registration statements, and incorporates by reference Item 105 of Regulation S-K.

F.3d 85, 95 (2d Cir. 2016) ("The plain language of Item 303 confirms our previous assumption that it requires the registrant's actual knowledge of the relevant trend or uncertainty. . . . It is not enough that it should have known of the existing trend, event, or uncertainty."); *Jaroslawicz v. M&T Bank Corp.*, 962 F.3d 701, 713 (3d Cir. 2020) ("[T]he text of Item 105 . . . naturally requires an allegation that a known risk factor existed at the time of the offering."), *cert. denied*, 141 S. Ct. 1284 (2021).

As discussed in the Section 11 analysis, Plaintiffs have not adequately pled Phoenix Tree had actual knowledge of facts that would undergird most of the alleged omissions, and the Offering Documents provided adequate risk disclosures to the extent knowledge could be inferred. Consequently, Items 105 and 303 cannot save Plaintiffs' hindsight pleading when that pleading did not hurdle the requirements of Section 11 of the Securities Act. *See Lopez*, 173 F. Supp. 3d at 35–36.

## VIII.   Plaintiffs' Claims Under Sections 12 and 15

Like their Section 11 claims, Plaintiffs' remaining claims under the Securities Act also fail. While Section 11 and 12 claims are "usually evaluated in tandem," *Lin v. Interactive Brokers Grp., Inc.*, 574 F. Supp. 2d 408, 416 (S.D.N.Y. 2008), Section 15 provides a distinct type of control person liability. "To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *Opera Ltd.*, 527 F. Supp. 3d at 562 (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007)). Without a "primary violation" under Section 11 or 12, then, control person liability under Section 15 will not arise. *See ATSI*, 493 F.3d at 108.

Therefore, "[i]n light of the dismissal of Plaintiffs' Section 11 claims against Defendants, Plaintiffs' Section 12 and Section 15 claims, which rely on the same underlying factual allegations, must also be dismissed." *Nurlybayev v. ZTO Express (Cayman) Inc.*, No. 17-cv-6130-LTS-SN, 2019 WL 3219451, at *8 (S.D.N.Y. July 17, 2019).

## IX.  Leave to Amend

Plaintiffs seek leave to amend the should the Court dismiss the Amended Complaint. When a complaint has been dismissed, permission to amend it "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a); *see Mirkin v. XOOM Energy, LLC*, 931 F.3d 173, 178 (2d Cir. 2019) (noting this "liberal amendment policy"). Leave to amend is granted.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** the motions to dismiss and **DISMISSES** the Amended Complaint without prejudice. Plaintiffs may file a Second Amended Complaint by April 15, 2022. Any such filing must be accompanied by a blacklined version showing all changes from the Amended Complaint. If Plaintiffs do not file a new pleading by that date, the dismissal of the Amended Complaint will be with prejudice.

The Clerk of Court is directed to close the motions at ECF numbers 56 and 59.

Dated: New York, New York
      March 14, 2022

SO ORDERED

_____
HONORABLE PAUL A. CROTTY
United States District Judge

25